**John H. FETZER, Jr. and C. C. Robinson, Appellees,**

v.

**BODCAW COMPANY, Appellant.**

**No. 79–1184.**

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1979.

Decided July 5, 1979.

H. Derrell Dickens, El Dorado, Ark., for appellant.

John H. Fetzer, III, Baton Rouge, La., and William G. Wright, Arkdelphia, Ark., for appellees; Hardin, Jesson & Dawson, Fort Smith, Ark., on the brief.

Before LAY, BRIGHT and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

This case, with respect to which federal jurisdiction is founded on diversity of citi-

zenship, involves the ownership, including the ownership of underlying minerals such as oil and gas, of a one hundred foot strip of land running through the West Half of the Northeast Quarter of Section 26, Township 19 South, Range 23 West in Columbia County, Arkansas, and containing slightly over six acres of land. The strip is part of the existing main line of the Louisiana & Arkansas Railway Company, which operates a railroad in South Arkansas and North Louisiana, and which is the corporate successor of the Louisiana & Arkansas Railroad Company which was formed in 1898.

The area in controversy is now claimed by the Railway Company on the one hand, and by Bodcaw Company (Bodcaw) on the other hand. Bodcaw is the remote corporate successor of the old Bodcaw Lumber Company (Lumber Co.) that operated in a number of South Arkansas counties, including Columbia, and in a number of North Louisiana parishes, in the latter part of the Nineteenth Century and perhaps into the relatively early years of the present century.

From time to time the Railway Company has executed oil and gas mining leases covering lands included in its right of way. The plaintiffs in this case, John H. Fetzer, Jr. and C. C. Robinson, own a working interest in an oil and gas lease executed a number of years ago by the Railway Co.[1] The lease covers the lands here involved, at times referred to as the "Section 26 lands," as well as other lands that are no longer involved in the litigation.

These "Section 26 lands" along with a number of other tracts of land have been combined into a single unit for the purpose of oil and gas development, and the oil well or wells located on the unit are managed by Bodcaw as the unit operator. Working interests in leases covering the lands lying in the unitized tracts are of varying proportions, and the majority of those interests appear to be owned by Bodcaw. Under the unitized operation Bodcaw bills other lessees for their proportionate parts of development and operational costs. The oil produced from the unit appears to have been purchased from Bodcaw by Cities Service Oil Company and to have been run through the pipeline operated by Louisiana-Nevada Transit Company.[2]

The controversy between the plaintiffs and Bodcaw did not arise before 1973. Prior to that year and during the development stage of the unit Bodcaw did not question the Railway Company's ownership of the minerals underlying its right of way in Section 26 or its right to execute leases involving underlying oil and gas.[3] And, indeed, the record indicates that Bodcaw billed the plaintiffs regularly for their share of development costs, and that plaintiffs paid the bills.

However, in 1973 Bodcaw took the position that it owned the minerals underlying the right of way of the Railway Company, and that leases executed by the Railway Company were invalid. When Bodcaw took that position, Cities Service Oil Company, that has been mentioned, promptly placed questioned proceeds from sales of oil produced from the unit into what is known as a "suspense account," as a result of which

---

1. Under a standard oil and gas lease in Arkansas the owner of the mineral fee generally reserves a royalty interest of $\frac{1}{8}$ free and clear of all costs of development and production. The lessee generally obtains a basic "working interest" of $\frac{7}{8}$ of the oil and gas in place with the right to explore for those minerals and remove them at his own expense. While the working interest is normally $\frac{7}{8}$ of the mineral fee, it may be somewhat less than that depending on whether the working interest is subject to "overriding royalty" interests.

2. Those two companies were the original parties defendant in the case, but they have passed out of the litigation and are not parties to this appeal.

3. We pause to point out that in the context of railroad conveyancing the term "right of way" may mean the geographical area over which the railroad operates or is authorized to operate; that area may or may not be owned in fee by the carrier. On the other hand, the term may simply mean the "right" of the carrier to operate in the geographical space involved, which right is frequently no more than an easement which may come to an end if the "right of way" ceases to be used for railroad purposes.

plaintiffs as lessees of the Railway Company have not been paid for any oil produced from the unit since the controversy between them and Bodcaw arose.

Plaintiffs commenced this suit for an accounting in the district court in October, 1973, and the case fell to then Chief (now Senior) District Judge Oren Harris. Numerous additional parties, including Bodcaw, came into the case. The case was ultimately submitted to Judge Harris on a voluminous record. He was called upon to construe two deeds executed, respectively, in 1898 and 1899, and he ruled in favor of the plaintiffs and against Bodcaw.[4] Bodcaw appealed and we reversed, not because of ultimate disagreement with Judge Harris' finding on the merits but because the court felt that the district judge had indulged an impermissible assumption as to the chronology of the two deeds that we just mentioned. *Fetzer v. Cities Service Oil Co.*, 572 F.2d 1250 (8th Cir. 1978). We remanded the case for further consideration.

As a result of that further consideration, the trial judge filed a second full but unpublished opinion in which he adhered to his original view that plaintiffs were entitled to prevail. Again, Bodcaw has appealed.

The rights of the parties are governed by Arkansas law, and the deeds involved in the case are to be construed by reference to the Arkansas law of conveyancing.

Both sides deraign title from a common source, namely the old Bodcaw Lumber Co. that has been identified. In the 1890's the Lumber Co. was engaged extensively in the cutting and milling of timber, principally pine, in South Arkansas, including Columbia County, and in North Louisiana.

The controlling stockholders of the Lumber Co. were the Buchanan brothers, William and James A. William Buchanan was President of the corporation and James A. Buchanan was the corporate Secretary. The Lumber Co. has not been an operating company for many years, and the Buchanan brothers have long since died.

In 1898 and prior thereto the Lumber Co. operated its own line of railroad on its own lands. The Section 26 lands involved here were acquired by the Lumber Co. in 1895. In connection with the railroad the company owned not only the land on which the tracks of the road were laid but also rolling stock, rails, cross ties and other railroad equipment. The northern terminus of the company line was the small town of Stamps in Lafayette County, Arkansas where the line connected with the main line of the St. Louis, Southwestern (Cotton Belt) Railway Company. The company line extended south and east from Stamps into northern Louisiana. It was still being extended southward in 1898.

In that year the Buchanans formed the original Louisiana & Arkansas Railroad Company, which we will call the "Railroad Co.," that was ultimately succeeded by the present Louisiana & Arkansas Railway Company, plaintiffs' lessor, which we have referred to as the "Railway Co."

On April 1, 1898 the Lumber Co. executed in favor of the Railroad Co. one of the two deeds that are the bones of contention here. We set out the instrument in full:

### DEED

KNOW ALL MEN BY THESE PRESENTS: That the Bodcaw Lumber Company, a corporation duly organized and incorporated under and by virtue of the laws of the State of Arkansas, by its President, William Buchanan, who is duly authorized to act herein, for and in consideration of the sum of Two Hundred Thousand Dollars ($200,000.00), One Hundred and Fifty Thousand Dollars ($150,-000.00) of which has been paid in cash, and balance of Fifty Thousand Dollars ($50,000.00) in note of even date herewith, executed by the Louisiana & Arkansas Railroad, the receipt of which is hereby acknowledged, has this day sold, transferred and delivered and by these

---

4. That ruling necessarily established that plaintiffs' lessor, the Railway Company, owned the underlying mineral fee title to the lands involved.

presents does sell, transfer and deliver to the said Louisiana & Arkansas Railroad, a corporation organized under the laws of the State of Arkansas, all its right, title, property and interest in and to the main line of Railroad extending from the St. Louis Southwestern Railway at Stamps, Ark. (and now known as the Louisiana & Arkansas Railroad), to a point in Louisiana at mile post 29, to which point said main line of railroad has been completed; also its right to and property in the grading for extension of said line of railroad up to engineer's station 1586. Also including what is known as the Taylor Branch of said line, leaving the said main line of railroad at Taylor station and extending eastward a distance of eighteen (18) miles, together with all other branch lines, spurs, side tracks, switches, one water tank and pumping equipment located at M.P. 16, round house at Buchanan station, all section houses and sand houses, and all right of way and franchises occupied by or belonging to said line of railroad, and including rolling stock and other property enumerated approximately as follows:

Two Baldwin locomotives, numbered 101 and 102.

Two cabooses, numbered 1 and 2.

One Hundred and sixty-seven (167) logging cars, with loading chains belonging thereto, cars being numbered 5 to 175.

One Box Car numbered 500.

All hand cars, push cars, tools and implements now used in the construction or maintenance of said railroad.

And also including the track fixtures or fastenings, with three (3) miles of new forty-five pound steel rails now on hand and not laid in the track.

TO HAVE AND TO HOLD the said Railroad property, right of way and equipment, with all the rights, privileges and franchises thereunto belonging, unto the said Louisiana & Arkansas Railroad and unto its successors and assigns forever, free from all liens and encumbrances whatever.

IN WITNESS WHEREOF the said Bodcaw Lumber Company has caused this instrument to be signed by its President and attested by its Secretary, and the corporate seal of said Company affixed hereto at its office in Stamps, Arkansas, on this first day of April, A.D. 1898.

BODCAW LUMBER COMPANY,
By /s/ Wm. Buchanan
President.

Attest:
/s/ J. A. Buchanan
Secretary.
(SEAL)

We do not know who drew that instrument. The record does establish that it was not acknowledged before a notary public until 1902 after which it was placed of record in the same year in both Columbia and Lafayette Counties.

In the meantime in 1899 the Lumber Co. for a stated consideration of $5.00 executed a "right of way" deed to the Railroad Co., which was promptly acknowledged and recorded. That deed granted to the Railroad Co. a right of way over a number of tracts of land, including the Section 26 lands in Township 19 South, Range 23 West.

Returning for a moment to the 1898 deed, it appears to resemble a quitclaim deed. It contains no express covenant of warranty; nor does it contain the granting words "grant, bargain and sell," which import a general covenant of warranty under the terms of the Arkansas statute that was in force in 1898 and prior years and which now appears as Ark.Stat.Ann. § 50–401 (1971 Repl.).

In his original opinion in the case the district judge referred to the 1898 deed as the "1902 deed," evidently referring to the date of its acknowledgment and recording, and he seems to have thought that the 1899 deed was actually the first of the two deeds. He felt that the 1899 deed conveyed an easement only, and that it was superseded by the "1902 deed" which the judge construed as vesting fee title to the lands in question in the Railroad Co. Given that chronology, and assuming the correctness of

the district court's interpretation of the "1902 deed," that instrument would have caused the Railroad Co.'s original easement over the lands to merge into the fee title that the Railroad Co. supposedly acquired by virtue of the "later" deed. *See* our discussion in *Fetzer v. Cities Service Oil Co., supra,* 572 F.2d at 1255–57.

In connection with the original appeal by Bodcaw it appeared to us that the trial court might have reasoned from a faulty premise as far as deed chronology was concerned, and that such a premise might have affected the conclusion reached. In remanding the case we said, 572 F.2d at 1257:

> The fundamental issue here is the intent of the parties. This is basically a finding of fact to be assessed from all of the evidence. As an appellate court, we think proper judicial policy requires that we refrain from full review of the merits until the district court has made its finding without consideration of an erroneous premise. Our observations here are in no way to be construed by the district court or the parties as an indication that the judgment for the plaintiffs was incorrect. We simply refrain from reviewing that issue at this time. The court's finding on remand can be reviewed here and can, of course, be set aside only if it is clearly erroneous.

Following the remand, the trial court gave further consideration to the matter, recognizing that the 1898 deed was effective as between the parties as of April, 1898. The district court felt that the 1898 deed conveyed a fee title to the right of way lands and not simply an easement, that there was a possible explanation for the delay in the acknowledging and recording of that deed, and that there was no real inconsistency between the act of the Lumber Co. in executing the 1898 deed and later executing the 1899 deed. As we have said,

the district court again decided the case in favor of the plaintiffs.

There is no question about the underlying principles of Arkansas law governing the construction of the instruments before the district court. Those principles have been laid down in a legion of decisions by the Supreme Court of Arkansas including such cases as *Gibson v. Pickett,* 256 Ark. 1035, 512 S.W.2d 532 (1974), and *Marshall v. Marshall,* 227 Ark. 582, 300 S.W.2d 933 (1957); *see also* Judge Matthes' summary in *Mothner v. Ozark Real Estate Co.,* 300 F.2d 617, 621 (8th Cir. 1962), and our own discussion in the original appeal in this case, 572 F.2d at 1255 *et seq.,* including the collection of cases cited in notes 7 and 8.

One of those principles is that an ambiguous deed is to be construed most strongly against the grantor, here the Lumber Co. *Gibson v. Pickett, supra,* 512 S.W.2d at 536; *Marshall v. Marshall, supra,* 300 S.W.2d at 936. Another principle is that where a deed does not manifest a contrary intent, an intent to convey a fee simple estate of inheritance is at least presumed.[5]

In much Arkansas litigation involving land titles and deed construction, the incidence of the burden of proof can be quite important, and in ordinary adversary litigation the party seeking relief, whether by way of a suit in ejectment or a bill to quiet title, must prevail on the strength of his own title and not on the weakness of the title of his adversary. That rule, however, does not apply where, as in this case, the parties derive title from a common source. In that situation, the party who has superior equity should prevail. The leading Arkansas case is *Eickhoff v. Scott,* 137 Ark. 170, 208 S.W. 421, 422 (1919), cited with approval in *Collins v. Heitman,* 225 Ark. 666, 284 S.W.2d 628, 632–33 (1955); *cf.*

---

**5.** Chapter 31, § 3 of the Revised Statutes of Arkansas, adopted in 1838, has been carried forward and is now codified as Ark.Stat.Ann. § 50–403 (1971 Repl.). That statute which was in force during the time with which we are concerned provides:

> The term or word 'heirs,' or other words of inheritance, shall not be necessary to create or convey an estate in fee simple, but all deeds shall be construed to convey a complete estate of inheritance in fee simple, unless expressly limited by appropriate words in such deed.

*Coulter v. O'Kelly*, 226 Ark. 836, 295 S.W.2d 753, 757 (1956), involving a situation wherein the parties did not claim title from the same source.

■ A trial court should endeavor to construe a deed from a consideration of the instrument itself, read as a whole, if by that means the intention of the parties can be determined. However, where such determination by that means is impossible due to ambiguity, the court may resort to extrinsic aids to the extent that they are shown by admissible evidence having legitimate probative value. Specifically, but without exclusiveness, the court may consider evidence of the relations between the parties, the relation between the grantor and the property, the facts and circumstances surrounding the transaction, and the contemporaneous construction placed by the parties on their own conveyances. *See, e.g., Abbott v. Pearson*, 257 Ark. 694, 520 S.W.2d 204 (1975); *Gibson v. Pickett, supra; Wynn v. Sklar & Phillips Oil Co.*, 254 Ark. 332, 493 S.W.2d 439 (1973); *Brown v. Windland*, 249 Ark. 6, 457 S.W.2d 840 (1970).

As to this case, we are satisfied that the 1898 deed was the "first deed," and that it was ambiguous. The situation was not helped by the delay in the acknowledging and recording of that deed or by the execution and prompt recording of the intervening deed in 1899. And, as a matter of fact, that deed itself is not free from ambiguity as far as the interest conveyed is concerned. The 1899 deed standing alone probably conveyed only an easement,[6] but we observe that it does not state expressly that it was intended to convey an easement only, and it does not contain the language frequently appearing in right of way deeds to railroads that the grant is limited to the period during which the land is used for railroad purposes.[7]

In evaluating the 1898–1902 transactions involving the Lumber Co. and the Railroad Co. evidenced by ambiguous deeds, Judge

Harris did not have the benefit of any parol evidenced as to the intents of the two companies. He was required to consider the issue before him in the light of the principles that we have mentioned, and he was required to do the best he could with the documentary materials at hand, including the deeds themselves and other more or less contemporary documentary evidence that he considered to shed light on the intentions of the parties.

In coming to his ultimate conclusion the district judge took into consideration a number of factors that we have also considered. Some of those factors are more significant than others and some are more valid than others. We find it unnecessary to list or discuss them.

■ Candidly, we think this is a close case with a difficult record. The district judge was called upon to construe Arkansas deeds involving Arkansas real estate; his views as to the governing law of Arkansas are entitled to great weight. We cannot say that the district court's ruling in favor of the plaintiffs was based upon a misconception of Arkansas law, or that it was arbitrary or capricious, or that it lacked substantial evidentiary support, or that it was clearly erroneous within the meaning of Fed.R.Civ.P. 52(a).

Accordingly, the judgment of the district court is affirmed.

---

**6.** *See* cases cited in *Fetzer, supra*, 572 F.2d at 1255, n. 7.

**7.** In its second opinion the district court pointed out that the 1899 deed might be construed as conveying a fee title rather than an easement.